Good morning, Your Honors. Still good morning. And may it please the Court, Jonathan Scruggs for the appellant, Jessica Bates. I will attempt to reserve five minutes for rebuttal. Your Honor, although there is a desperate need to place foster kids, Oregon has categorically excluded all foster and adoption applicants who cannot support certain controversial views on gender identity. The district court correctly applied strict scrutiny to this exclusion because it compelled and restricted my client's speech based on viewpoint, but upheld it anyways under this difficult standard. There are many reasons why this is wrong, but I want to focus on two today. First, Oregon has many less restrictive alternatives to accomplish any legitimate goals, such as pairing kids at the matching stage with like-minded families, which is exactly what the… How old was Bates was seeking, as I recall, elementary school-aged children, right? At the time of her application, her oldest child was 10, and she was seeking a child under the age, siblings, under the age of 9. So that means, would somebody be in a position to estimate somebody who was 9 or 8 or 7, what their future proclivities might be with regard to sexual orientation? Well, I think they could, Your Honor. I mean, they could do a longitudinal study, but here's the point I was trying to make. Oregon hasn't provided any evidence that it tried or that it's not possible. Because Oregon carries the burden… That's not the question I'm posing, though. Is it a given that, in fact, you can accurately determine at that point? Because if it's not, then why can't the state say, well, the child who we are seeking to place, the child who is in the care and custody of the state, not somebody from another agency which your client could turn to, but the care and custody of the state, if in fact that person turns out to have a sexual orientation inconsistent with your client's religious beliefs, then the state can't be confident that the child they're seeking to place will be treated in a way consistent with the child's own personal preferences. Yes, Your Honor. It's not a given. Again, Oregon didn't provide any evidence that it was a given or not a given. Well, Oregon's the one responsible here. Why is it required to prove up the wisdom? I mean, I frankly have real doubts about the wisdom of the state's action, but I'm having trouble figuring out why that makes it a violation of your client's rights. Your client could turn elsewhere and has chosen not to. So why is it Oregon has to conform itself to your client's preferences? Because Oregon is engaged in viewpoint discrimination, Your Honor, and therefore strict scrutiny applies. Well, I'm having trouble with that proposition, too. They're not saying that your client can't express her preferences. They're saying that if we place a child in the state's custody into your client's care, that your client can't be required to adhere to the state's standards and the child's preferences. I mean, is a school teacher entitled to teach, a public school teacher entitled to teach a class anything that the teacher wants to proclaim? Well, I think that's a good contrast, Your Honor, because in that situation, the state's engaged in government speech, but no one here is even arguing that my client is engaged in government speech, and that would be impossible to prove under the shirtlift factors. One thing you mentioned was the pairing, so that would be a kind of upfront thing, and it may not capture every child who may later decide certain issues of sexual orientation or gender identity, but what about like a system of monitoring or check-ins? Is that something that other states or that HHS does? That's exactly what, and I was going to this, Your Honor, the Biden administration does. They have this system. Not only do they pair like-minded families with kids on the front end, but they have a constant system of check-in, and in fact, if a child during that process being placed with the family has an objection, they go and check-in with the agency, and there's a process for handling that, and that respects the autonomy of the children because the children actually get a say in that process. Here, Oregon has categorically excluded kids up, or applicants up front and really taken away the choice. So how does the HHS policy work mechanically? Do you know? I mean, is it regularized, and how does the check-in process specifically work? Well, it starts off, Your Honor, but they send out a notice to all children over the age of 14, every child over the age of 14, or any child they know who identifies as LGBT, and they say, look, if you want a designated placement, let us know, and, you know, they'll go and manage that with the agency. Then throughout the process, there's constant check-ins. The agent goes in with the house, you know, meets, has constant check-ins. Now, this is for foster care. I'll say for adoption, you know, eventually the child becomes fully the child of the parent, right? So you're not going to have check-ins in that scenario, but this is in the foster care scenario. Your client isn't seeking a child over 14. That's right. Well, that's right, Your Honor, but, again, the burden's on the state because this is strict scrutiny to show these methods are ineffective. No, only if we accept your proposition. This is, in fact, viewpoint discrimination, and I really have trouble understanding how this is inhibiting your client's ability to express her views or practice her religion as she wants. Well, Your Honor, the only focus is on the child and what she says and how she treats the child, not the rest of the world, and if the best interest of the child is supposed to be the uppermost priority from the state's perspective, responsible as it is for children in its care and custody, how is this viewpoint discrimination? Your client can say whatever she wants to anybody else. Well, Your Honor, that's never been, or you can always speak your other message elsewhere, but here the government is essentially conditioning a benefit or a license on my client not to expressing her particular views. As the district court said, inherent in the rule is that my client cannot espouse certain views on LGBT status, and the way the rule operates is on page 31 of the record. Not espouse, speak to the particular child. She can espouse all she wants to other people. Well, Your Honor, it's, you know, I don't think we should force the Muslim family to say, you know, you can't explain your religious beliefs in your own house to people in your own household, that you can hold these beliefs, but you can't espouse them. Well, this kind of gets to a question I have in the case, which is, what does it mean to support a child in any of these things? Is there, we have some of the training documents, but in this case, when your client applied, did she have to sign any kind of document sort of attesting, I will do this, or did this just come about because she said, I want you to know I object to this? The latter, Your Honor. She went through the training and said, and the training lays it out, and I think the district court looked at the record, and like I said, this is how the district court interpreted the rule. It said that the way the rule operates on the plaintiff is to compel positive speech while simultaneously restricting negative speech, and that's consistent with the position the Oregon's taken. They've taken the position that this is essentially licensed conduct, and they can regulate anything. All the speech. You know, they come and check the home to see, is this a suitable home? Is there some guidance document or list of 20 questions that are supposed to be asked in that context specific to these issues or to supporting the child's religion or race or anything else in this policy? We don't know they are because we were kicked out at the front door before those, I think that would be the appropriate thing to have is have a dialogue about, and again, it's undisputed that my client will love and respect every child, every LGB child, will not reject or denigrate or vilify them, but care for them and love them. Those are undisputed facts in the record, but Oregon has taken the position that categorically, and this is how it reads in the text, you have to support in all ways, including by using certain pronouns, including by being willing to take a child to pride parades. You know, and this goes back to the system that really hurts the kids and the applicants. I think you can imagine a scenario where you, for example, have a Orthodox Jewish child who has kosher, for example, and there's only one applicant who's also Orthodox and Jewish. And shares the beliefs about human sexuality with my client. We would then exclude that applicant, even though that would be the best paired person to care for that child, because of the religious beliefs. This undermines the whole nature of the... You see, you're commenting on the policy wisdom, and I'm not quarreling with you there, but your case isn't a policy wisdom case. That's a case that has to be made to the state of Oregon. Well, your honor, I was going to say it actually is, because again, this is under strict scrutiny or heightened scrutiny, and so Oregon carries the burden to show that their policy is not overbroad and they're not least restrictive alternatives. And I don't see how they can prove that when the Biden administration, when most states don't do this policy. They accommodate the interests and respect First Amendment rights. They respect the rights of, you know, yes, your honor. You talk fast and you're well informed. Could the state of Oregon... There are some people who have strongly held religiously based beliefs about vaccination. Could the state of Oregon say, to participate in this program, you must be willing to have a child vaccinated against communicable diseases? Could they do that? Yes. And they already have that, actually. That's a separate provision regarding medical. And would that violate, would the implementation of that violate the religious beliefs, the First Amendment protected religious beliefs of a person who held those views? Well, no, your honor, assuming they apply generally, it's a generally applicable application, right? I mean, obviously... This one is? Well, we disagree with that. We can talk about... Tell me the difference between a requirement that you accept SOGI, if we can use that phrase, and a deeply held religious belief about vaccination. Well, this one clearly encompasses... What's the difference? The difference is this one clearly encompasses speech and compels speech based on viewpoint and restricts speech based on viewpoint. That is, and that's exactly what the district court held. So that's an enormous difference. That lines us up with 303 Creative and Hurley and all those lines of cases, and even Barnett. And to put a pin on your honor, I mean, a different state, Judge Clifton, to go to your point about how these policy decisions, well, a different state might have conservative policy views. And the question is, can they tell an LGBT applicant, you can't express pro-LGBT views to a child? Or you must use a biology-based pronouns in order to affirm a child's sex. I think that would compel speech and restrict speech, just like Oregon is doing. So this is a dangerous principle that Oregon has put forward, that we have the right, because we view all this as conduct, to compel and restrict any speech whatsoever. I mean, that gives really a blank check to the government. And again, to your point, Judge Clifton, we don't need, we're not asking to prevent the government from restricting its policy views just to comply with the Constitution. Other states do this. This is not an impediment for the vast majority, 19 states filed an amicus brief in this. This would essentially cripple the adoption and foster care system, because you would force every parent or applicant to affirm and agree with every views. We should force the atheist applicant to affirm the Trinity, because the child believes that. We should force the Muslim applicant to, you know, affirm various religious views. I mean, I just don't think the Constitution would comply with that. Does the record say anything about, some of this, we're talking sort of what would happen if this were to happen, but presumably children are adopted by parents and then conflicts arise just as they can in families with biological children. Is there anything in the record that tells us how the state has dealt with this when it's arisen in the context of sexual identity or gender issues? No, Your Honor, again, Oregon has not put forth any of that evidence that, you know, they can't do that or they failed to do that. They provided no evidence about that, and we view that as a failure. But we can compare, again, what we have with the Bond Administration scheme, where they have this intricate scheme of doing check-ins, and in that situation, even when you have a parent who says, hey, I can't be a designated placement, what then goes, which that's the terminology the Bond Administration uses for a family who shares kind of pro LGBT views, then the agency goes to that parent and says, hey, can we work with you to try to keep this child in the home? Can you take more training? Can you do whatever? And then if that doesn't work, then they take the child and put them somewhere else. But it's an intricate system, and Oregon hasn't shown that that is not possible. In fact, my understanding is actually Oregon sends out notices regularly to children in the system, in the foster care system. And to highlight the point, Your Honor, this happens all the time, and we can't predict if a child is going to be disabled. We can't predict if a child is going to change religions, right? But we don't force all Muslims to be willing to speak positively about Christianity, because I think that would undermine the whole system. The system is about taking care and placing every child. It's not about any particular child, right? And that's the whole nature of the system, is to have a diversity of views so that you can match children with the best family. And that's really going back to the point of, you know, when you do have these constitutional rights at stake, when you give the government the power to pick and choose favorite views, the burden is on them, and they need to have a high burden. Otherwise... But in your mind, it's okay for them to, say, have a vaccine requirement? Well, Your Honor, again, the vaccine requirement doesn't bring up speech issues. It could bring up free exercise issues, depending on how they apply the system. I mean, if they're picking and choosing how they... Just change the facts of this case. Your client comes to this interview and says, I'm copacetic with everything the state of Oregon requires, but I want you to know something. I have deeply held religious beliefs against vaccination for communicable diseases. Is Oregon required to say, to adhere to that? Again, Your Honor, again, that's a separate provision that we weren't rejected under. I don't know how Oregon is applying its vaccination. I'm asking you, what's the difference? The difference, one perspective difference is one's about speech and one's not. And the other difference is how they apply their support provision. The client in the interview says, because of my religious beliefs, I cannot deal with the child LBGT. I just can't do it. I won't do it. What's the difference between an applicant saying that and saying, I won't subject the child to vaccination because of my beliefs? Again, Your Honor, I'll go back and I keep saying it. One is about speech. It's undisputable that this situation is requiring compelling speech and restricting speech based on viewpoint. One is not. One is about conduct. And the secondary thing is we think that under the conduct is whether she would be willing to submit a child who has this preference to medical treatment. And she said, I won't. Well, Your Honor, they exclude there's a separate provision about medical treatment. She wasn't excluded under that. She was excluded under the support provision. As the U.S. Supreme Court said in Kennedy v. Bremerton, this is footnote 8 of that decision, you can't accept a post-talk rationale. We have to accept the rationale as given. She was excluded under the support provision, which, as the district court said and as you plainly read, does regulate speech. I see I'm over time. I'd like to reserve the rest of my time for rebuttal. Thank you. Okay. Thank you. Thank you. Good morning and may it please the court and counsel. Philip Thonis on behalf of the state defendants at police. The district court acted within its discretion in denying plaintiff's request for a preliminary injunction because the court correctly concluded that plaintiff was unlikely to succeed on the merits of her free exercise and free speech claims. I want to, I think, reorient the analysis a little bit. My friend on the other side goes directly to the question of whether the state can satisfy strict scrutiny, but of course we only get to strict scrutiny if this court concludes that the rule at issue here compels plaintiff's speech akin to the compelled speech in cases like Barnett, Woolley, and 303 Creative. The state very much disputes that the rule compels plaintiff's speech and is subject to strict scrutiny. We offer the court, I think, two related but doctrinally distinct analyses about how to view this rule and why this rule does not represent a compelled speech case. I guess I do have difficulty with this position. I mean, the district court obviously didn't agree with it. Correct. But isn't the whole point of this to help, the whole theory behind this is to make children feel comfortable within their home based on the state's views of some of these issues. Wouldn't speech be absolutely essential to that in terms of things you should not say and things you really should say to ensure that level of comfort? Yes, absolutely, Your Honor. How could this not restrict or compel speech? It seems, as the district court says, inherent in the design of this is that you need that. That's part of the protection. So there is no, the state does not dispute and did not dispute below that speech is certainly implicated by this rule. But the important distinction is that speech is an aspect of the conduct of providing care to children who are in the state's legal custody. So in our view, that's the correct framework to view this case under in that the rule, not just the specific subsection 2K, but the entirety of this rule and indeed the state's regulations more broadly, regulate the conduct of caregivers who provide childcare to children in the state's legal custody. Speech is, of course, part of the conduct of providing childcare.  But it's, I mean, reading the pamphlets, it seems sort of central, right? The the pronouns, right? The use of specific pronouns, the strong suggestion to use particular flags or other kinds of things to educate and show children examples of positive experiences of people who have, you know, similar gender and sexual identity, right? All of this is all all speech related. It's all speech. Those examples certainly are, Your Honor, but but and I think this gets to your earlier question to my friend about what what is the proper scope of this rule? What does it mean to support or accept or respect a child's identity? It could be those things. It could be other things. It could be ensuring that a child has clothing that conforms with the child's gender identity or grooming habits, haircuts, things like that. There's a myriad of ways that a foster parent or any parent, for that matter, any caregiver provides child care. Some of those involve speech. What if Ms. Bates had said, you know, I'm I'm OK with the with the pronouns. I'm OK with with the flags, but I'm not OK with the hormone therapy piece of this. Would she still be denied permission to be foster parent? Yes, Your Honor, she would. And I think my friend acknowledges that. Well, so you have to agree to basically all of these things. This is one thing I had a question about, which I asked your friend on the other side, which is where is there some document or sort of list of 20 things that, you know, you kind of check the box and you've got to you got to agree to each of these 20. It doesn't seem like there is the state has such a thing. No, I'm not aware of any such list or or I think maybe one of the M.E. Kebris pejoratively pejoratively described this as sort of a litmus test. I mean, it isn't it's it's the state is making a policy decision about how it wants children in its legal custody to be cared for. The rule is that isn't that a litmus test? I mean, they seem to be the same. That seems to be I think your argument is this is very important. That's why we need to we need to ask for this. Right. Of course, Your Honor. But I am not aware of sort of a checklist about, you know, these are the specific things that the state is would expect or require it. But I think that somebody in, you know, who's doing it, trying to do these approvals actually go about assessing whether a parent will be able to respect and support a child as to their sexual orientation or gender identity. So the expectations of the department are explained through the the class that plaintiff went through, and then it is up to the applicant to affirm to the department, you know, there that that they are able to, in fact, respect. Yeah. How do they do that? Is there some document that they signed saying that or or do they just affirm it by not objecting to it? I don't, Your Honor, I do not know precisely. In this case, plaintiff did inform Garcia, the DHS certifier, that she could not comply with this with this rule. In other cases, I'm I'm not sure if there is sort of an affirmative yes, I can comply or a no, I'm not going to be able to comply. The Oregon system allows for some selectivity based on gender, race, religious affiliation, et cetera, doesn't it? Uh, in what way, Your Honor? Well, can an applicant for foster care, if the state calls a potential Christian family and says they have a foster child who's Jewish, does it allow does the system as it exists now allow the state to not make that pair to allow the individual to state that preference? So that would be something that would happen beyond the certification process, which is what this rule takes place at the front end of the certification. I understand that. But when you get to the certification process, um, do you allow some selectivity and matching? My understanding, Your Honor, is that the no, no certified resource parent or adoptive resource, I think is required to take any part, any given foster child into their home. Um, and I think that would be up to them to decide. Uh, opt out, if you will, based on race, gender, religious affiliation. If that was a white family could say, oh, we won't take a black child. I suppose they could say that. Although I think that would raise serious problems about their continued compliance with, with the rule. But the flip side of that is that process, which you're describing, is the state trying to match people with the child's best interest at heart, um, and to have the best match possible? Yes, correct, Your Honor. However, I think it's important to, to keep in mind, and this is one of the reasons why, in the state's view, the, the federal HHS rule doesn't accomplish what the state wants to accomplish here, which is that many times the state doesn't know or can't know beforehand what a child, you know, which aspects of a child's identity, uh, are going to potentially present a problem to the, to the caregiving family. Children, of course, change over time. If it's a long-term placement, the child might, you know, go through a process of evolution or, or self-reflection or, or things, and that's, that's the whole point of why the state wants to make this assurance at the front end, that regardless of the child who does end up in your home, and regardless of their, of that child's characteristics, you are telling us that you will be able to accept, respect, and support those aspects of that. And suppose this rule did not exist. Okay. Okay. How likely is it that, um, Oregon Adoptive Services would place an, um, LGBTQ child with a family that, uh, was opposed to that from a religious point of view? I, I don't have hard numbers for you, Your Honor. I can say that the evidence in the record that was included with the, uh, Chang Declaration does show pretty clearly that LGBTQ children are overrepresented in the foster care system and also experience worse outcomes in the foster care system. That's, that's numbers. That's just numbers. That is, that's numbers. Yeah, you're, you're correct, Your Honor. Okay. I want to go back to, to the speech issue and just ask you, are, are there things that she cannot say to the children in the home? Would that be the, your position? Yes, Your Honor. But I don't think it's quite as, uh, restrictive as, as plaintiff would have it. So there is, the state is not trying to extinguish plaintiff's viewpoints about human sexuality or gender identity. And of course that would present a constitutional problem. What the state asks plaintiff to be able to do is to, in, you know, recognizing that she does hold those beliefs, be able to parent or provide childcare to a child that recognizes that that child might be different and might not conform with those beliefs that plaintiff holds and to provide childcare in a way that respects the child. So that might mean that there are certain things that plaintiff couldn't say to the child. Um, telling a child that homosexual, if, you know, if, if the child was homosexual in the state's view, the plaintiff could not tell the child that homosexuality is a sin and the child, you know, would go to hell just to give an example. That's not in the record. I'm just saying that as an example, um, or to use, uh, an example based on race. We think that the rule would prohibit a foster parent from calling a child a racial slur. But as the system currently exists, once you're past the pre-certification process and you've got a pool of applicants who are not persuaded, don't have a problem with the general requirements. Um, and a family has called about a foster child and they say, we want you to know this child is African-American. Could the family say, Oh, I'm sorry, I can't do that. I think if the, if without being tossed out of the system, I, I'm not positive your honor. I think that that would cause concern for DHS and could lead to decertification. If, if, if a family refused to accept a child on the basis of race or religion or religion or disability, well, I think this disability, I think I want to be clear and careful because there are many foster children who have profound medical needs and those children often require very specific placements and not all foster parents would be able to take children like that or, or would be expected to. Um, so that might not be a great example. What is the difference between this and the blaze case out of the Eastern district of Washington? Is there, is there any difference? Are these essentially two cases that have come out different ways? I think so, your honor. Um, we just disagree with the analysis, with the district court's analysis in that case, and we do disagree of course, with some of the district court's analysis in, in our own case about the compelled speech issue in blaze. One thing that the court said was that this, when you take the sum in total of all of these, um, requirements, it, it falls disproportionately on people who have a certain viewpoint and that viewpoint is, uh, most typically correlated with a religious viewpoint. And therefore under the free exercise clause, it'd be subject to strict scrutiny, kind of on a gerrymandering theory. How do you address that point? So I, your honor, I believe that goes to the, uh, question, whether it's generally applicable and, and the state's view is that the, this, this rule applies to everyone without exemption. Uh, so we don't, we don't have a sort of a formal exemption of course, like, like the court found problematic in Fulton, but neither is there. There's no, there's no evidence in this record. And frankly, speaking on behalf of the state, the state just doesn't really care why a person might not be able to respect, accept and support a child. We just want them to be able to do that. So if that comes from a place of religious conviction or a philosophical viewpoint, or I'm an atheist, but I think, you know, that Caucasian people are the superior race and I don't want to have, I mean, those are all problems. Doesn't it seem clear that the people who are most likely to have difficulty with this policy are people who have a certain religious viewpoint about sexual orientation? That's what the district court said in, in, in Blaze. I have difficulty seeing why that's not correct. I don't, I don't think I agree with that, your honor, but even if that's true in the abstract, as long as the rule is neutral and generally applicable, there just isn't a free exercise problem. Um, of course, so long as we satisfy rational basis review.  But I guess it gets to the question of whether the rule is neutral, right? So if you can compare this to the hypothetical Judge Hawkins was asking about the vaccines, when you look and read the pamphlets and they're talking about a certain viewpoint, clearly about gender identity and sexual orientation, which the state believes is fundamental and to the level of things like what you need to, what you should display in your home, what kind of ways in which you should address a child, what kind of places you should and shouldn't take them, you know, as an example, not taking them to a religious, uh, activity that may not be supportive of LGBTQ plus, um, uh, people. When you look at all that together, doesn't that strongly show that this is really oriented around a particular viewpoint that, that stands in opposition to one that religious people like Miss Bates have? Certainly it is oriented around a view, it's oriented around the state's viewpoint that familial acceptance is important and is critical to the wellbeing of, of children in its care that, I mean, as sending us, I mean, I do understand your honor's point that that might end up conflicting and very much does conflict with certain religious views, but that at the end of the day, so long as we're not in a, a strict scrutiny sort of, you know, problem with general applicability policy, you know, the state is permitted to make those, that policy choice for itself about how it wants folks to provide care to children. And I guess maybe to summarize, I don't know how that necessarily moves the ball one way or the other by saying, well, this, this happens to the state's policy choice happens to conflict with the, the religious convictions of a certain subset of the population. I mean, could it, could a state, could the state have a, have a policy that says, you know, you need to accept and support a certain political view? I don't, I don't know your honor. It would seem kind of problematic to me if, if, if you did. So I think the, I think the reason the state would not be able to have such a rule goes to the, the underlying interests and the states, I guess I would, I would question what evidence there would be that asking people to adhere to a certain political view advances the wellbeing of. Right. But I mean, this more gets to the question of, of the narrow tailoring. I don't think it answers the, the tier of scrutiny, right? I mean, assuming that strict scrutiny applies to this, why would you say this policy is narrowly tailored as to Ms.  Because the, like I said earlier, the, the state's ability to be ensured that all certified, uh, caregivers will respect, accept, support a foster child, it has to come at, at the front end. And because of the, the problems we highlighted earlier about the state may not know what, uh, the child's identity will be like in the future, there might be, uh, little time or no time or resources to make the sort of matching that a plaintiff suggests. Um, I mean, I guess with unlimited resources, that might be, uh, an option the state can take, but we, the state's interest is that, is in ensuring that everyone certified, uh, agrees to this and will provide this type of care to their children. What evidence, I mean, Ms. Bates, this kind of gets into the question of what does it mean to support someone? I think Ms. Bates' view would be, she does intend to support someone to a point. And your view is that, that, that point is not enough. But what if, what evidence is there in the record that the degree of support that she would provide would be detrimental to a child who is, you know, three or four years old and who, who may later identify as a different, in a different way in terms of sexual orientation or gender identity? Well, Your Honor, I believe plaintiff very expressly told DHS that she would not be able to use pronouns that did not conform with the child's sex assigned at birth. And that is very much an issue where the state believes that using pronouns that align with the child's gender identity is an important aspect of the child's well-being. So granted, that might not be an issue when the child is a toddler, but again. What is, but so what evidence in the records shows that the use of that particular, you know, of pronouns, for example, is important to the, to the development of the child? Because I understand the high level point that children need a supportive environment to succeed. I don't think there's much dispute about that. The question is what, what types of supportive environments are we talking about? Environments that acknowledge and respect the child's all, you know, those aspects of the child's identity. And there is strong evidence that LGBTQ children do experience a high level of familial reject, which is part of the reason why they're overrepresented in foster care and that ensuring familial acceptance and acceptance, acceptance, including using pronouns that align with the child's gender identity is a critical part of, of ensuring the child's well-being because it leads to, because I think the lack of familial acceptance leads to, to worse outcomes. What if it were a child who is older and who comes from a family like Ms. Bates, a religious family? Could Ms. Bates, could that child be assigned to Ms. Bates or she, she's just unable to have any child with her because of her, her decision not to comply with this policy? If I could finish the question, Your Honor. Um, that's correct. So if, because plaintiff was not certified, she, you know, she cannot care for, for any child in the state's legal custody at, at this point. Um, so yes, it, she would need to comply with, with rule 2K. In that policy, does that pertain, there have been references in the briefs and so forth about private placements or is, is this set of rules, one that applies specifically to children who've been placed in the custody of the state? Does it apply to somebody seeking to say adopt through a different social welfare agency? No, Your Honor, it does not. The, the rule, again, if I, if I may finish briefly, the, the rule expressly applies only to applicants and DHS defines an applicant as someone who is applying for certification as a resource family or adoptive resource. So they would be caring for children who are in the state's legal custody. It seems like the panel may have exhausted their questions for you. Um, I'm going to thank you for your argument this morning. Unless you have a brief wrap up, we'll, we'll hear from your opposing counsel. Just to ask the court to affirm. Thank you. Thank you. Uh, thank you, Your Honor. A few points. I'll try to talk fast to go on the politics point, Your Honor. Interesting enough. Don't talk too fast.  Yeah, exactly. On the, in 2022, actually, Columbia came out with a study of 845 seniors who said that those with liberal political views had higher rates of depression and loneliness. So you could easily see a state under that logic trying to do something on, on  Uh, Judge Hawkins, to go to your question, uh, Fulton rejected that same argument and Fulton, they said, Hey, we're making an exclusion categorically upfront, not on the back end. And the court said, we, we're not going to buy that argument that it infects the whole system when you make exclusions on the back end. Um, uh, uh, Judge Clifton, I want to go to your point about, um, well, let me actually, let me back up on that Fulton point. It's undisputed that they do allow exemptions based on age, disability, sex, and quote, inappropriate sexual behavior. That's on page 90, 91 in the record. So there are exemptions going on. Um, Judge Clifton, I want to go to your point that the Supreme Court has never allowed viewpoint discrimination, whether it be a subsidy, a government program, uh, an ex, uh, a tax exemption in any type of system has never allowed viewpoint discrimination. So it's no answer that you could go somewhere else. I mean, they, the logic could be, well, you know, you could provide fire services. Does it suggest that this, this lawsuit is contrived that in fact, Ms. Bates could foster, could adopt, but can't do it with a child that's been placed in the legal custody of the state? No, Your Honor. It, the, all the other methods are exceptionally expensive. She's a mom of five raising children on her own, a widower. Uh, the only way that she can adopt and care for a loving child is through the, uh, uh, the foster care system that's out there. Those other methods are not, uh, are not available to her for various reasons. And it's just, you know, Your Honor, like saying that you can't provide fire services if you can, you know, hold certain beliefs, we can always provide private fire services. That's not an answer under Supreme Court doctrine. Um, I do also want to go to the point about support. I think Judge Bress, you raised, I want to quote from, uh, the, the studies they provided, the author of their studies on page 107 of the record said this, parents and families can support their LGB child even if they believe that being LGBT is wrong by simple actions that don't require them to accept a behavior or identity they don't condone. This includes talking with their child respectfully, uh, requiring the other family members to respect their child. And it has a list going on in there, things that Ms. Bates will do. It's undisputed that she will care and accept and love any child, even if they identify as LGBT. Uh, just wrapping up, Your Honor, I want to acknowledge that this is a controversial topic. There's, you know, people of good faith on both sides, but we don't have to get foster care kids caught in the middle. Oregon can comply with the constitution, uh, achieve its goals and allow Ms. Bates, uh, to provide a loving home for a child who desperately needs it. We asked the court to reverse and to order that district court to enter an injunction in Ms. Bates' favor. Thank you. I want to thank both counsel for the helpful briefing and argument. This matter is submitted. That concludes our calendar for this morning and we'll stand in recess until tomorrow.
judges: HAWKINS, CLIFTON, BRESS